# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

DELAWARE HUMAN AND CIVIL
RIGHTS COMMISSION,

    Plaintiff, *ex rel.*

MOHAMMED SEDGHI and PAULA
BURKHARDT-SEDGHI,

      v.

SCHELL BROTHERS, LLC, and
JONATHAN HORNER,

    Defendants.

C.A. No: S23C-04-004 MHC

## ORDER

Submitted: March 12, 2025
Decided: April 28, 2025

*Upon Defendants' Motion to Dismiss,*
**MOTION GRANTED IN PART AND DENIED IN PART.**

Kristen S. Swift, Esquire, Kaufman Dolowich, LLP, 222 Delaware Ave., Suite 720, Wilmington, DE 19801, Attorney for Plaintiff.

Elizabeth S. Fenton, Esquire, Ballard Spahr, LLP, 919 N. Market Street, 11th Floor, Wilmington, Delaware, 19801, Attorney for Plaintiff. Lila R. Miller, Esquire, Zoila E. Hinson, Esquire, David S. DePriest, Esquire, Relman Colfax, PLLC, 1225 19th Street NW, Washington, DC, 20036, *Pro Hac Vice*, Attorneys for Plaintiff.

David C. Hutt, Esquire, R. Eric Hacker, Esquire, Morris James, LLP, 107 W. Market Street, Georgetown, Delaware 19947-1438. Kelly E. Farnan, Esquire, Richards, Layton, & Finger, P.A., 920 North King Street, Wilmington, Delaware 19801, Attorneys for Defendants.

**CONNER, J.**

## INTRODUCTION

Defendants Schell Brothers, LLC (hereinafter "Schell Brothers") and Jonathan Horner, Esq. have filed what is now their third Motion to Dismiss, seeking to dismiss six of Plaintiff-Intervenors' eight counts in its amended complaint, relating to a house purchase agreement which went south allegedly for discriminatory reasons. Defendants move to dismiss the six contractual claims on grounds of: (1) being time-barred by contractual terms; (2) Defendant Horner not being independently liable; and (3) five counts that fail to state a claim.

## FACTS

On November 20, 2020, Plaintiff Mohammad Sedghi and Plaintiff-Intervenor Paula Burkhardt-Sedghi ("Plaintiffs" or "the Sedghis") entered into an agreement (hereinafter "Purchase Agreement") to purchase a new home from Schell Brothers in one of its communities in Selbyville, Delaware. The Sedghis made a 10% down payment of $82,925 to secure the Purchase Agreement. On April 19, 2021, Mr. Sedghi spoke on the phone with Mr. Horner, General Counsel for Schell Brothers, to seek clarification about an addendum in the Purchase Agreement. Mr. Horner did not answer Mr. Sedghi's questions and instead allegedly threatened to terminate the Purchase Agreement pursuant to a provision giving Schell Brothers the power to unilaterally terminate the Purchase Agreement at any time with anyone who does not fit within the "community, culture, or operations." After hearing this threat, Mr.

2

Sedghi advised he would exercise his fair housing rights. This caused Mr. Horner to terminate the Purchase Agreement, allegedly stating "I know your kind of people. I know how you people are."

Mr. Horner followed up with an email confirming the termination of the Purchase Agreement, noting that it was in part occurring because Mr. Sedghi stated he would sue Schell Brothers. Mr. Sedghi still wanted to purchase the home so he agreed to the addendum which he originally questioned and made numerous requests to Schell Brothers to reconsider the Purchase Agreement. Schell Brothers refused the requests to reconsider and Mr. Horner also refused to return the Sedghi's down payment unless the Sedghis agreed not to pursue litigation.

On May 28, 2021, Mr. and Mrs. Sedghi filed a complaint with the Delaware Division of Human and Civil Rights (the "Division") and United States Department of Housing and Urban Development. The Sedghis allege Defendants violated their rights under the Delaware Fair Housing Act ("DFHA") and Federal Fair Housing Act ("FFHA") by refusing to sell them the property they had contracted to purchase and by retaliating against them for asserting their fair housing rights. The Sedghis further allege Defendants discriminated against them based on Mr. Sedghi's religion and national origin. The Division investigated the claims and issued a charge (the "Charge") pursuant to 6 *Del. C.* § 4610(f)(2) on July 25, 2022.

3

## PROCEDURAL POSTURE

### *Round 1*

On August 11, 2022, pursuant to 6 *Del. C.* § 4612(a), Defendants elected to have the claims asserted in the Charge decided in a civil action. Thus, the Delaware Human and Civil Rights Commission (the "Commission") filed a complaint, titled "Complaint," against Defendants for violating 6 *Del. C.* §§ 4603(b)(1), (2), and (3), 4604(a), and 4618 (hereinafter "Complaint No. 1"). Complaint No. 1 was filed on April 6, 2023, but its corresponding praecipe was not filed until May 19, 2023.

Defendants responded to Complaint No. 1 with their first motion to dismiss (hereinafter "Motion to Dismiss No. 1"), arguing that the action was not "promptly commenced" within the meaning of 6 *Del. C.* § 4612(n)(3) and that the Commission lacked standing to bring the complaint on behalf of Mrs. Burkhardt-Sedghi, due to the Division only issuing a charge on behalf of Mr. Sedghi and not her. In an order on October 13, 2023, this Court denied Motion to Dismiss No. 1 in part, rejecting the "promptly commenced" argument, but granted it in part as to the standing argument. This Court found pursuant to 6 *Del. C.* § 4612(n)(1), the action could not be commenced on behalf of Mrs. Burkhardt-Sedghi, but pursuant to § 4612(n)(4), she still had the right to subsequently intervene in the civil action. Afterwards, the Defendants filed an Answer to Complaint No. 1 on November 6, 2023.

4

*Round 2*

The Sedghis moved to intervene on February 7, 2024 which was resolved by a stipulation on April 23, 2024 and granted on April 25, 2024. The Sedghis filed their complaint as intervenors, titled "Plaintiffs' Complaint," on May 2, 2024 ("Complaint No. 2"). Defendants officially responded to Complaint No. 2 with an opening brief to "Defendants' Motion to Dismiss Counts I-VI of the Plaintiffs-Intervenors' Complaint" filed May 31, 2024 (Motion to Dismiss No. 2).

*Round 3*

Before anything else proceeded with Motion to Dismiss No. 2, on June 26, 2024, the Sedghis filed "Plaintiffs' Amended Complaint" ("Complaint No. 3"). In Complaint No. 3, Count VI alleges discrimination under both the FHA and DFHA and Count VII alleges retaliation for exercising fair housing rights (hereinafter collectively "the Discrimination Claims"). The claims based on alleged breaches of contract (hereinafter collectively "the Contractual Claims") consist of: Count I breach of contract; Count IV "bad faith breach of contract;" Count II seeks return of the downpayment through "replevin, conversion, & detinue"; Counts III and V fraud; and Count VIII unjust enrichment.

Mr. Sedghi passed away shortly after Complaint No. 3 was filed. After some procedural shuffling to substitute Mr. Sedghi's estate as a new party, Defendants responded to Complaint No. 3 with a motion to dismiss, titled "Defendants' Motion

5

to Dismiss Counts I-V and VIII of the Plaintiffs-Intervenors' Amended Complaint," ("Motion to Dismiss No. 3") on September 9, 2024. Motion to Dismiss No. 3 is the subject of this opinion.

Plaintiffs' Answering Brief was timely filed on October 18, 2024. Defendant's Reply Brief was timely filed on the extension deadline of November 8, 2024. Oral argument was held March 12, 2025.

## STANDARD OF REVIEW

In evaluating a Motion to Dismiss under Superior Court Civil Rule 12(b)(6), the Court must assume all well pleaded facts in the Complaint to be true.[1] A Complaint will not be dismissed unless the Plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[2] A Complaint may not be dismissed unless it is clearly without merit, which may be a matter of law or fact.[3] "Vagueness or lack of detail in the pleaded claim are not sufficient grounds alone to dismiss a complaint for failure to state a claim."[4]

---

[1] *Rodgers v. Erickson Air-Crane Co., L.L.C.*, 740 A.2d 508, 510 (Del. Super. 1999) (citing *Nix v. Sawyer*, 466 A.2d 407, 410 (Del. Super. 1983)).
[2] *Outdoor Techs. Inc. v. Allfirst Fin. Inc.*, 2000 WL 141275, at *3 (Del. Super. Jan. 24, 2000) (citing *Nix*, 466 A.2d at 410).
[3] *Id.* (citing *Diamond State Tel. Co. v. Univ. of Del.*, 269 A.2d 52, 58 (Del. 1970)).
[4] *Diamond State Tel. Co. v. Univ. of Del.*, 269 A.2d 52, 58 (Del. 1970) (citing *Morgan v. Wells*, 80 A.2d 504, 505 (Del. Ch. 1951)).

# ANALYSIS

Defendants move to dismiss on three grounds. First, Defendants argue that all six contractual claims are contractually barred by the terms of the Purchase Agreement requiring claims to be brought within one year. Second, Defendants argue that the Contractual Claims fail to state a claim against Defendant Horner in his individual capacity. Third, Defendants argue that the Contractual Claims, besides Count I for breach of contract, fail to state a claim generally against either Defendant.

## I.     Plaintiffs' claims are not time-barred.

*Parties' arguments*

Defendants argue that all six Contractual Claims are contractually barred by the terms of Purchase Agreement requiring claims to be brought within one year. Defendants argue the relevant time period starts April 19, 2021, the time of the alleged discrimination, to February 2024, when the Sedghis moved to intervene.

Plaintiffs' responses to the contractual statute of limitations argument are that the enforceability of the contract is still at issue and therefore needs further discovery, that the one-year time-limit is unreasonable, and that the time-limit is tolled either by the continuing harm doctrine or by 6 Del. C. § 4613(a) and 42 U.S.C. § 3613(a).

7

*Framework*

For this statute of limitations analysis, the Court must determine: (a) when the claim occurred; (b) when the action was commenced; (c) what is the applicable time limit for claims; and (d) if the time between the claim occurring and action commencing exceeded the applicable time limit was the time period tolled.

### (a) When did the claim occur?

"Both the Federal and State Fair Housing Acts impose a two-year limitation period by statute: in the Federal Act running from the later of the 'occurrence or termination' of the wrong; in the State Act after the later of the occurrence, termination or actual or reasonable discovery thereof."[5]  "[E]ither an act of discrimination is a discrete act, initiated and completed (an 'occurrence'), or it is a pattern of discriminatory behavior (a 'continuing violation'), the 'termination' of which would start the clock on the statutory period."[6]  "[C]urrent effects alone cannot breathe life into [stale] discrimination [claims]. . . ."[7]

Here, the wrong allegedly occurred during the April 19, 2021, phone call and follow-up emails. Plaintiffs do not allege with any specificity events occurring after April 19, 2021, that give rise to further claims.

---

[5] *Henlopen Landing Homeowners Ass'n v. Vester*, 2015 WL 5316864, at *2 (Del. Ch. Sept. 14, 2015).

[6] *Id.* at *4.

[7] *Garcia v. Brockway*, 526 F.3d 456, 463 (9th Cir. 2008) (quoting *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618, 619 (2007)).

Plaintiffs argue that the harm is continual due to the retention of the Sedghis' down payment, but the first refusal to give the Sedghis back their down payment is one discrete act. The Defendants' later refusals are failed settlement negotiations. (The Court notes Schell Brothers is still in possession of the down payment.) Plaintiffs ask this Court to adopt the continuing wrong theory as to the civil rights claims, but also imply it should apply to all related claims. The practical effect, among other things, would be Plaintiffs' conversion claim, Count II, would functionally have no statute of limitation, which runs contrary to Delaware law.[8] Additionally, courts across the country have refused to adopt the continuing harm doctrine to apply to continuing effects of discrete past discriminatory acts.[9]

Thus, the claim arose April 19, 2021. The Court will not apply the continuing harm doctrine for purposes of this analysis.

---

[8] *See* 10 *Del. C.* § 8106; *see e.g.*, *Liberty Mut. v. McCracken*, 2001 WL 1456815, at *2 (Del. Super. Aug. 21, 2001).

[9] *See e.g.*, *Taxi Connection v. Dakota, Minn., & E. R.R. Corp.*, 513 F.3d 823, 824–26 (8th Cir. 2008) (refusing to apply the continuing harm doctrine to continued refusal to do business with a woman's company for allegedly discriminatory and retaliatory reasons); *Garcia v. Brockway*, 526 F.3d 456, 462–64 (9th Cir. 2008) (refusing to apply the continuing harm doctrine to design and construction which fail to accommodate disabilities).

**(b) When was the action commenced?**

According to Superior Court Civil Rule 3(a), ". . . an action is commenced by filing with the Prothonotary a complaint or, if required by statute, a petition or statement of claim, . . . and a praecipe directing the Prothonotary to issue the writ specified therein."[10] The FFHA and DFHA do not require filing a complaint with the Division and receiving a charge, instead allowing private parties to initiate their own suit.[11] Since filing a complaint with the Division is not required by statute, that means commencement of the action is not measured by such a complaint. Therefore, the action was commenced when both Complaint No. 1 and its corresponding praecipe were filed with this Court. Thus, commencement of this action took place on May 19, 2023, when this Court received the corresponding praecipe to Complaint No. 1.

Although the Sedghis were named plaintiffs in Complaint No. 1, Mrs. Burkhardt-Sedghi lacked standing to be an original party, as determined in the order from October 13, 2023. Instead, she had a statutory right to subsequently intervene. Defendants mistakenly assert that the Court should consider the commencement of their action from the time of the motion to intervene on February 7, 2024.

---

[10] Super. Ct. Civ. R. 3(a).
[11] *See* 6 *Del. C.* §§ 4610–13; 42 U.S.C. §§ 3610–13.

Intervenors are parties who subsequently enter an ongoing action through a motion to intervene with an accompanying pleading setting forth the claim, pursuant to Superior Court Civil Rule 24. For subsequent pleadings to be measured from the commencement of the suit for a statute of limitations defense, they must "relate back" to the original complaint pursuant to Superior Court Civil Rule 15. Claims by an intervenor under Rule 24 can relate back to the original filing for purposes of statute of limitations defenses under Rule 15.[12] "Notwithstanding the general liberal policy toward amendments imparted by Rule 15, a motion to add or substitute a party after the statute of limitations has run must be denied if it fails to satisfy the requirements of Rule 15(c)."[13] Additionally, "[a]s long as [the] defendant is fully apprised of a claim arising from specified conduct and has prepared to defend the action against him, his ability to protect himself will not be prejudicially affected if a new plaintiff is added, and he should not be permitted to invoke a limitations defense."[14]

The statute of limitations for filing a FFHA complaint does not apply to the addition of new parties in a reasonably amended administrative complaint.[15] Thus,

---

[12] *See MAXXAM, Inc./Federated Dev. S'holders Litig., In re*, 698 A.2d 949, 958 (Del. Ch. 1996).
[13] *Mullen v. Alarmguard of Delmarva, Inc.*, 625 A.2d 258, 263 (Del. 1993) (citing *Mergenthaler, Inc. v. Jefferson*, 332 A.2d 396, 398 (Del. 1975)). The exact requirements under Rule 15(c) have changed since *Mullen*, but those requirements still must be met. *See Schott v. Hechinger Co.*, 1997 WL 358306, at *5 (Del. Super. Mar. 20, 1997).
[14] *MAXXAM, Inc./Federated Dev. S'holders Litig., In re*, 698 A.2d 949, 958 (Del. Ch. 1996) (quoting *Child, Inc. v. Rogers*, 377 A.2d 374, 377 (Del. Super. 1977)).
[15] *U.S. v. Forest Dale, Inc.*, 818 F.Supp. 954, 965 (N.D. Tex. 1993).

11

in *U.S. v. Forest Dale, Inc.*, a Texas district court found that an intervenor's FFHA discrimination claim was not barred by the statute of limitations, where the intervenor filed her complaint with United States Department of Housing and Urban Development (HUD) within one year after the alleged discriminatory practice and once HUD brought the case to federal court, she intervened as of right more than two years after the alleged discriminatory practice.[16]

Here, the Sedghis' claims in Complaint No. 2 relate back to the Commission's claims from the first Complaint. These claims "arose out of the conduct, transaction, or occurrence set forth. . . in the original pleading," as required by Rule 15(c)(2). Additionally, the Defendants have been on notice of these claims immediately from Mr. Sedghi's threats to pursue litigation during the phone call on April 19, 2021.

Complaint No. 3 was amended by leave of Defendants[17] in compliance with Rule 15 and relates back to Complaint No. 1 for the same logic as Complaint No. 2. Thus, the commencement of this action took place on May 19, 2023.

### c. What time limit applies in this case?

Defendants argue that the Purchase Agreement contractually sets a time-bar for claims to occur within one year of the alleged harm. Plaintiffs argue that this contractual limit is unreasonable, and instead request the statutory two-year period

---

[16] *Id.* Similar to this case, the disabled person allegedly discriminated against in *Forest Dale* passed away soon after the event at issue and the plaintiff-intervenor was his widow.
[17] *See* Pltfs.' Am. Compl. (hereinafter "Complaint No. 3") at ¶ 10.

for seeking claims under both the Delaware Fair Housing Act, at 6 *Del. C.* § 4613(a)(1), and the Federal Fair Housing Act, at 42 U.S.C. § 3613(a)(1).

Delaware "follow[s] the general principle that contractual limitation of actions periods are valid if they are reasonable."[18] Delaware has previously explained the underlying rationale that the statute of limitations serve, ". . . the interest of the public to discourage the litigation of old or stale demands. . ." to prevent the difficulties of properly litigating those demands, and those interests are helped, not harmed by those provisions.[19] Furthermore, "[i]t is generally held that, in the absence of express statutory provision to the contrary, a statute of limitations does not proscribe the imposition of a shorter limitations period by contract."[20] Therefore, Defendants are correct that generally Delaware will enforce a one-year contractual limitations instead of the applicable statute of limitations.[21] Additionally, the mirrored language of the DFHA and FFHA both do not explicitly state that parties cannot contract to shorten the two-year prescribed period of 6 *Del. C.* § 4613(a)(1) and 42 U.S.C. § 3613(a)(1)(A).[22] Thus, the contractual limit of one-year is the applicable time limit.

---

[18] *Shaw v. Aetna Life Ins. Co.*, 395 A.2d 384, 386 (Del. Super. 1978).
[19] *Id.* (quoting *Kelly v. President, Dirs., and Co. of Farmers Bank of State of Del.¸* 24 A.2d 539, 541 (Del. Super. 1942)).
[20] *Wesselman v. Travelers Indem. Co.*, 345 A.2d 423 (Del. 1975).
[21] *See e.g.*, *Ottendorfer v. Aetna Ins. Co.*, 231 A.2d 263, 265 (Del. 1967); *Rumsey Elec. Co. v. Univ. of Del.*, 358 A.2d 712, 714 (Del. 1976); *Woodward v. Farm Fam. Cas. Ins. Co.*, 796 A.2d 638, 642–43 (Del. 2002); *3M Co. v. Neology, Inc.*, 2019 WL 2714832, at *7 (Del. Super. 2019).
[22] *See* 6 *Del. C.* § 4613(a)(1); 42 U.S.C. § 3613(a)(1)(A).

**d. Has the statute of limitations been tolled?**

The alleged harm arose on April 19, 2021, and the action was commenced on May 19, 2023, which is two years and one month later. The applicable time limit is the contractual limit of one year. Thus, the final question in this analysis is whether the contractual limit was tolled as a matter of law.

"According to the doctrine of inherently unknowable injuries, sometimes referred to as the 'discovery rule,' a statute of limitations will not run 'where it would be practically impossible for a plaintiff to discover the existence of a cause of action.'"[23] However, no theory would toll the statute beyond the point where the party was objectively aware, or should have been aware, of the facts giving rise to the wrong.[24] Although Plaintiffs allege fraud, Plaintiffs were aware of the issues with this case as of the April 19, 2021 phone call, and brought claims to the Division within a month, thus the discovery rule of tolling does not apply.

Both 6 *Del. C.* § 4613(a)(1)(B) and 42 U.S.C. § 3613(a)(1)(B) provide that, "[t]he computation of such 2-year period shall not include any time during which an administrative proceeding under this [act] was pending with respect to a complaint or charge under this [act] <u>based upon such discriminatory housing practice</u>."[25] Furthermore, 6 *Del. C.* § 4613(a)(3) provides that:

---

[23] *Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 788–89 (Del. Ch. 2014).
[24] *Capano v. Capano*, 2014 WL 2964071, at *9 (Del. Ch. June 30, 2014).
[25] 6 *Del. C.* § 4613(a)(1)(B); 42 U.S.C. § 3613(a)(1)(B) (emphasis added).

14

An aggrieved person may not commence a civil action under this subsection <u>with respect to an alleged discriminatory housing practice</u> which forms the basis of a charge issued by the Division if an Administrative Hearing Officer or Panel has commenced a hearing on the record under this chapter with respect to such charge.[26]

This language mirrors that of 42 U.S.C. § 3613(a)(3).

Defendants argue that "discriminatory housing practice" should be limited to Plaintiffs' claims of discrimination and retaliation and should not encompass the related Contractual Claims. In other words, Defendants argue tolling under 6 *Del. C.* § 4613(a) and 42 U.S.C. § 3613(a) should not apply to Counts I–V and VIII. Defendants propose the correct course of action when the Division's investigation was approaching the contractual one-year deadline was to bring an action in Delaware Superior Court for only the Contractual Claims, and then later bring the discrimination and retaliatory claims in a separate action. Defendants posit that it was the Division's responsibility to notice the contractual time-limit and its potential effect on Plaintiffs' ability to bring suit, despite this Court being unaware of any prior caselaw on this narrow issue.

Plaintiffs argue that "discriminatory housing practice" should include related contractual claims when the contractual breach is for discriminatory reasons. Plaintiffs contend that Defendants' proposed course of action would be a waste of judicial resources.

---

[26] 6 *Del. C.* § 4613(a)(3) (emphasis added).

The DFHA ". . . shall be liberally construed to the end that its purposes may be accomplished and all persons may fully enjoy equal rights and access to housing for themselves and their families."[27] The FFHA notes "[i]t is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States."[28]

This Court finds that "discriminatory housing practice" under 6 *Del. C.* § 4613(a) and 42 U.S.C. § 3613(a) includes related contractual claims. Liberally construed, the statutory schemes do not provide any guidance how to navigate Defendants' proposed claim splitting, and the general rule of *res judicata* bars litigation between the same parties if the claims in the later litigation arose from the same transaction that formed the basis of the prior adjudication.[29] Defendants' reading would force aggrieved individuals stuck waiting for the Division's investigation to forfeit some claims to bring other claims through no fault of their own. As far as this Court is aware, Delaware and FFHA caselaw has yet to rule on this narrow issue. However, courts across various jurisdictions consistently refuse to bar Plaintiffs from raising FFHA claims due to technical defects entirely attributable

---

[27] 6 *Del. C.* § 4601(b); *see also* 1 Del. Admin. C. § 602-14.3 ("[Delaware's Fair Housing] regulations shall be liberally construed to accomplish the purpose of the applicable laws.").
[28] 42 U.S.C. § 3601.
[29] *RBC Cap. Mkts., LLC v. Educ. Loan Tr. IV*, 87 A.3d 632, 645 (Del. 2014).

to a government agency's failure to investigate and prosecute claims in a timely manner.[30]

Furthermore, this Court notes the public policy concerns that California, Kansas, and New Jersey have with contractual limits to discrimination statutes, with each finding contractual limits to raise claims void as a matter of public policy.[31] These public policy concerns dictate that restricting the time to bring discrimination claims necessarily impedes the enforcement of the statutory rights meant to prevent discrimination.[32] However, this Court notes that each of these example cases involved a limit of six months rather than one-year.[33] It also recognizes the District of Delaware case, *Johnson v. DaimlerChrysler Corporation*, which upheld a contractual limitations of six-months for an employment discrimination claim as reasonable.[34] However, the *DaimlerChrysler* court explicitly based its decision more on the *pro se* plaintiff's behavior, rather than the reasonableness of the contract,

---

[30] *See e.g.*, *Baumgarden v. Sec'y, U.S. Dep't of Hous. & Urb. Dev.*, 960 F.2d 572, 575–79 (6th Cir. 1992); *U.S. v. Beethoven Associates Ltd. P'ship*, 843 F.Supp. 1257, 1259, 1261–63 (N.D. Ill. 1994); *N.D. Fair Hous. Council, Inc. v. Allen*, 319 F.Supp.2d 972, 979 (D.N.D. 2004); *cf.* 123 Stat. 5 § 1–2 (2009) (Congress passing a law overturning the United States Supreme Court decision of *Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 550 U.S. 618 (2007), which had interpreted the statutory scheme of federal wage discrimination claims as having strict deadlines, as contrary to Congressional intent).

[31] *See Ellis v. U.S. Sec. Assocs.*, 169 Cal.Rptr.3d 752 (Ct. App. 2014); *Rodriguez v. Raymours Furniture Co., Inc.*, 138 A.3d 528, 530 (N.J. 2016); *Pfiefer v. Federal Express Corp.*, 304 P.3d 1226 (Kan. 2013).

[32] *See e.g.*, *Pfiefer v. Federal Express Corp.*, 304 P.3d 1226, 1234 (Kan. 2013).

[33] *See Ellis v. U.S. Sec. Assocs.*, 169 Cal.Rptr.3d 752 (Ct. App. 2014); *Rodriguez v. Raymours Furniture Co., Inc.*, 138 A.3d 528, 530 (N.J. 2016); *Pfiefer v. Federal Express Corp.*, 304 P.3d 1226 (Kan. 2013).

[34] *Johnson v. DaimlerChrysler Corp.*, 2003 WL 1089394, at *4 (D. Del. Mar. 6, 2003).

concluding with: "[i]f [the plaintiff] had filed the instant suit within one year of her discharge, or perhaps if she had initiated the case immediately after receiving her right to sue letter, the court may have taken a different view of her. . . predicament."[35] This Court recognizes that there are distinguishable enough facts to explore whether the contractual limit in this case should be considered void as a matter of public policy. However, this Court finds a liberal construction of 6 *Del. C.* § 4613(a) and 42 U.S.C. § 3613(a) strikes a balance of these underlying concerns without necessitating this Court to resolve whether this contractual limit should be deemed void as a matter of public policy.

With the understanding that tolling under 6 *Del. C.* § 4613(a) and 42 U.S.C. § 3613(a) includes related contractual claims, the clock stopped on May 28, 2021, when Mr. and Mrs. Sedghi filed a complaint with the Division and United States Department of Housing and Urban Development. Thus, tolling applied 39 days after the alleged harm of April 19, 2021.

The Court could measure the proceedings formally ending with the Division issuing the Charge on July 25, 2022. The action was commenced May 19, 2023, which is 298 days after issuing the Charge, creating a total of 337 days elapsed that were not tolled. Alternatively, the Court could measure the proceedings ending with Defendants' election to proceed with a civil action pursuant to 6 *Del. C.* § 4610(f)(2)

---

[35] *Id.* at *6.

on August 11, 2022, which is 281 days before the action commenced, creating a total of 320 days elapsed that were not tolled. Either way, once tolling is applied, this action commenced before the time limit of one year. Thus, Plaintiffs' Contractual Claims are not time-barred and Defendant is not entitled to dismissal on these grounds.

## II. Plaintiffs fail to state valid claims against Defendant Horner as to the Purchase Agreement.

*Parties' Arguments*

In Complaint No. 3, Plaintiffs state: "Mr. Horner's actions described herein are as an agent of Schell Brothers and as an individual, he is part of this suit in both capacities."[36] Plaintiffs further state: "[i]n acting or failing to act as alleged herein, each employee or officer of each corporate defendant was acting in the course and scope of his or her actual or apparent authority. . . or the alleged acts. . . were subsequently ratified and adopted. . . ."[37]

Defendants argue that Defendant Horner is a corporate officer who is not individually liable for the Contractual Claims related to the Purchase Agreement.

Plaintiffs in their response do not disclaim the possibility that Defendant Horner could be liable as a corporate officer, but instead try to leave as many doors open as possible, which Plaintiffs' counsel referred to during oral argument as due

---

[36] Complaint No. 3 at ¶ 4.
[37] *Id.* at ¶ 6.

to an "abundance of caution." Plaintiffs argue that just because Defendant Horner is Defendant Schell Brothers's legal counsel, it does not *de facto* make him a corporate officer, and that further discovery is needed.

*Analysis*

The parties agree that Defendant Horner has an attorney-client relationship with Defendant Schell Brothers. There are three different routes for theories of liability for Defendant Horner as a party of the contract: as outside counsel; as an individual; and as a corporate officer. However, none of these theories are viable, and thus Defendant Horner is entitled to summary judgement as to the Contractual Claims.

*A. Individual Theory*

Outside Plaintiffs broadly stating, "Mr. Horner's actions described herein are as an agent of Schell Brothers and as an individual, he is part of this suit in both capacities,"[38] which is a conclusion of law inserted into Plaintiffs' Complaint No. 3 most likely in response to Defendants' earlier motions to dismiss, there are no factual allegations to present a colorable claim. There are no allegations of Mr. Horner having personal motives or interests that are independent of Defendant Schell Brothers

---

[38] *Id.*

20

In the general fact section, Mr. Horner is specifically named for facts about his communication with the Sedghis, in which multiple times he is identified as Schell Brothers counsel and never described in any manner as acting in his personal capacity.[39] Mr. Horner is lumped in with Schell Brothers as "Defendants" in Counts I-IV and VIII. In Count V, Mr. Horner is identified as the person making the allegedly fraudulent representations but is still otherwise lumped in with Schell Brothers

In *Yu v. GSM Nation, LLC*, a party tried to work around Delaware Superior Court's lack of subject matter jurisdiction over piercing the corporate veil by "alleg[ing] (***without any factual support***) that '[defendant] benefitted from [fraudulent] transfers' and 'made transfers by himself in his individual capacity.'"[40] The *Yu* court granted a dismissal as to that defendant.[41]

Plaintiffs assert this Court cannot discount the possibility that Defendant Schell Brothers could disclaim Defendants Horner's actions,[42] but Schell Brothers have claimed Horner's actions[43] and Plaintiffs have not provided any factual allegations supporting their loose hypothetical to the contrary. Thus, Plaintiffs have not pled a case supporting an individual liability theory against Defendant Horner.

---

[39] *Id.* at ¶ 14–16, 18, 27, 29
[40] *Yu v. GSM Nation, LLC*, 2018 WL 2272708, at *13 (Del. Super. Apr. 24, 2018) (emphasis added).
[41] *Id.*
[42] Answering Br. at 31.
[43] Opening Br. at 33–36.

*B. Outside Counsel Theory*

If Defendant Horner simply was Defendant Schell Brothers lawyer, he is not responsible for his client's contract. "An attorney is deemed to possess general authority to act on behalf of his client in the prosecution of an action for which he has been retained. In our system of representative litigation, 'each party must be bound by the acts of his lawyer-agent.'"[44] Defendant Schell Brothers is responsible for its contract, not its lawyer. Thus, Plaintiffs have not pled a case supporting an outside counsel liability theory against Defendant Horner.

*C. Corporate Officer Theory*

If instead this Court treats Defendant Horner as a corporate officer, then a corporation is only liable for torts committed within the scope of employment.[45] "A corporate officer does not step out of his corporate role unless he 'seeks to gain a benefit independent of their financial interest resulting from their employment by or investment in [their employer].'"[46]

Here, Plaintiffs have specifically alleged that each officer of the corporate Defendant Schell Brothers was acting within the scope of employment,[47] and do not identify any benefit Mr. Horner had independent of Defendant Schell Brothers.

---

[44] *Barlow v. Finegan*, 76 A.3d 803, 805 (Del. 2013) (citations omitted).
[45] *Draper v. Olivere Paving & Constr. Co.*, 181 A.2d 565, 569 (Del. 1962).
[46] *Anschutz Corp. v. Brown Robin Cap., LLC*, 2020 WL 3096744, at *18 (Del. Ch. June 11, 2020) (quoting *Amaysing Techs. Corp. v. Cyberair Commc'ns, Inc.*, 2005 WL 578972, at *8 (Del. Ch. Mar. 3, 2005)).
[47] Complaint No. 3 at ¶ 4.

For contractual claims, "Delaware law clearly holds that officers of a corporation are not liable on corporate contracts as long as they do not purport to bind themselves individually."[48] Here, Plaintiffs do not allege that Defendant Horner bound himself individually to the Purchase Agreement.

When an employee or officer of a company does not bind himself or herself to a corporate contract individually, "[c]onsequently, a plaintiff who seeks to sue an officer of a corporation must pierce the corporate veil to do so."[49] As the Delaware Court of Chancery has sole subject matter jurisdiction over actions to pierce the corporate veil, the Delaware Superior Court lacks jurisdiction over such claims.[50] To that point, the Delaware Superior Court has previously dismissed for lack of jurisdiction claims alleging that an officer engaged in fraudulent conduct within their individual capacity such that the claim "reads like an improper attempt to pierce the corporate veil."[51]

Plaintiffs have generically alleged that Defendant Horner engaged in fraudulent conduct within his individual capacity without any further explanation such that the claim reads like an improper attempt to pierce the corporate veil. This Court lacks subject matter jurisdiction to entertain this theory. Thus, Plaintiffs have

---

[48] *Ruggiero v. Futuragene, PLC.*, 948 A.2d 1124, 1132 (Del. Ch. 2008) (quoting *Amaysing Tech. Corp. v. CyberAir Commc'ns, Inc.*, 2005 WL 578972, at *3 (Del. Ch. Mar. 3, 2005)).
[49] *Thomas v. Hobbs*, 2005 WL 1653947, at *2 (Del. Super. Apr. 27, 2005).
[50] *Yu v. GSM Nation, LLC*, 2018 WL 2272708, at *6 (Del. Super. Apr. 24, 2018).
[51] *See id.* at *13.

not pled a case supporting a corporate officer liability theory against Defendant Horner.

### D. Unjust Enrichment

"Unjust enrichment cannot be used to circumvent basic contract principles recognizing that a person not a party to a contract cannot be held liable to it."[52] As the analysis above establishes, there are no theories tying Defendant Horner as an independent party to the contract. Plaintiffs cannot go after Defendant Horner directly for unjust enrichment as a way to sidestep the fact he was not a party to the contract.

Although Plaintiffs raise concern that Defendant Schell Brothers will later disaffirm Horner' actions, Schell Brothers would still be vicariously liable for the Discrimination Claims[53] and still be responsible for the Contractual Claims as a party to the Purchase Agreement. Even if there is a possibility that Defendants could later launch crossclaims, meritorious or not, that possibility does not grant Plaintiffs the right to include Defendant Horner as jointly and severally liable to the Contractual Claims.

---

[52] *Kuroda v SPJS Holdings, L.L.C.*, 971 A.2d 872, 880, 889 (Del. Ch. 2009).
[53] *See* 24 C.F.R. § 100.7(b).

Accordingly, the motion to dismiss Defendant Horner with respect to the Contractual Claims (Counts I–V and VIII) is **GRANTED**. He remains in this case as a defendant for Counts VI and VII.

### III. Plaintiffs do not state contractual or tort claims against Defendant Schell Brothers outside of Count I, breach of contract, pled alternatively as Count VIII, unjust enrichment. Thus, Defendant Shell Bros. is entitled to dismissal of Counts II-V.

*Parties' Arguments*

Defendants raise four separate arguments to eliminate the Contractual Claims besides Count I (breach of contract) as improperly pled. First, Defendants argue that Count II (replevin, conversion, and detinue) is duplicative and contrary to Delaware law. Second, Defendants claim Counts III (Deceit and Bad Faith During Contract Negotiation) & V (Fraud) are impermissible rehashes of the breach of contract claim as tort and are insufficiently pled. Third, Defendants argue that Count IV (bad faith breach of contract) is not a separate cause of action from Count I. Finally, Defendants argue that Count VIII (unjust enrichment) must fail due to it being based on a breach of contract.

Plaintiffs respond that all claims are properly pled. Plaintiffs argue the retaliatory retention of the down payment as ransom to force Plaintiffs to waive their rights is a tort separate from the breach. They also contend the down payment represents an economic interest in the property providing the right to purchase the

25

property.  Plaintiffs assert Counts III–V are sufficiently pled and Count VIII is a valid alternative pleading to the breach of contract.

### a.  Count II: Replevin/Conversion/Detinue

While the parties discuss the differences between replevin, conversion, and detinue,[54] the main point is Count II seeks recovery of the down payment in tort. When a plaintiff's claim arises solely from a breach of contract, the plaintiff "generally must sue in contract, and not in tort."[55]  "Thus, in order to assert a tort claim along with a contract claim, the plaintiff must generally allege that the defendant violated an independent legal duty, apart from the duty imposed by contract."[56]

The parties' arguments focus on *Kuroda v. SPJS Holdings, L.L.C.*, a 2009 Court of Chancery decision which dismissed a conversion claim as improperly pleaded when the plaintiff was only paid 90% of what he was owed by contract.[57] The *Kuroda* court rejected the plaintiff's theory that the tort duty violated was a breach of the duty to not convert others' property as a circular argument, and that it also did not fall under the narrow exception to the general rule prohibiting claims for conversion of money, the exception being the return of identical money.[58] The

---

[54] *See* Opening Br. at 23–25; Answering Br. at 16–20.
[55] *Kuroda v SPJS Holdings, L.L.C.*, 971 A.2d 872, 880, 889 (Del. Ch. 2009) (quoting *Data Mgmt. Internationale, Inc. v. Saraga*, 2007 WL 2142848, at *3 (Del. Super. July 25, 2007)).
[56] *Id.*
[57] *Id.* at 880, 889.
[58] *Id.* at 889–90.

26

identical money exception applies when the money "can be described or identified as a specific chattel."[59]

Here, Plaintiffs fail to state a tort claim under Count II separate from the breach of contract claim in Count I. The identical money exception does not apply, as this is not a specifically identifiable chattel but simply a lump sum related directly to the contract at issue. Plaintiffs may have requested "identical" money in its complaint[60] but have not specifically identified the down payment deposit as a unique chattel or otherwise explained how the Court can determine which money is "identical" to that which is pled. Furthermore, Plaintiffs do not identify any specific value to the "identical money" or why Plaintiffs' recovery would not be otherwise satisfied by any other cash except the cash provided to the down payment. Thus, the identical money exception does not apply.

Plaintiffs try to argue that the down payment creates an interest in the property which must be returned as the property has since been sold and thus specific performance is not feasible. But even if this Court were to hypothetically accept that theory, the Plaintiffs are not seeking possession of that "interest" beyond the form of the cash of the down payment. This argument slaps a new coat of paint on the

---

[59] *Xu Hong Bin v. Heckmann*, 2009 WL 3440004 (Del. Ch. Oct. 26, 2009) (citing *Goodrich v. E.F. Hutton Grp., Inc.*, 542 A.2d 1200, 1203 (Del. Ch. 1988)).
[60] *See* Compl. No. 3 at ¶ 58.

same request for the cash value of the down payment as part of the breach of contract damages.

Plaintiffs try to argue that there is an independent legal duty by attempting to retaliate against Plaintiffs for exercising their legal protections to sue for discrimination.[61] But the alleged retaliation is regarding claims based on Defendants' allegedly discriminatory reasons to breach the contract, and the return of that money is outlined by the contract, as Plaintiffs themselves explicitly pled later in the complaint.[62] The pleadings as presented are that Defendant Schell Brothers breached the contract, then demanded a settlement to waive that initial breach under the threat of breaching even harder if Plaintiffs did not accept that settlement. Even if the Court were to accept at face value Plaintiffs' assertions that the ". . . Sedghis claim a right to be free from retaliatory conduct associated with their purchase of real estate. . . ,"[63] this retaliation is not independent of the breach of contract. Rather, it directly flows from the breach. Thus, the motion to dismiss Count II as to Defendant Schell Brothers is **GRANTED**.

---

[61] *See* Answering Br. at 17.
[62] *See* Compl. No. 3 at ¶¶ 83, 85.
[63] Answering Br. at 17.

*b. Count IV: Bad Faith Breach*

Section 11(C) of the Purchase Agreement outlines the rights of Defendant Schell Brothers, including to terminate due to "culture," and outlines its obligations if it were to breach, including returning the Sedghis' down payment. The Plaintiffs allege that instead, after breaching for discriminatory reasons, the Defendants tried to force the Sedghis to waive their legal protections from housing discrimination by dangling the down payment as leverage despite having no legal right to do so.

Plaintiffs argue that this claim is for the allegation that not only have Defendants breached, they breached for discriminatory reasons, followed by discriminatory retaliation, creating a separate cause of action. Plaintiffs also argue that if Section 11(C) is unenforceable due to Seller's rights to discriminate based on "culture," the Court may use Count IV to reimpose Section 11(C)'s obligations for Defendants to return the down payment as an "implied covenant."

Defendants argue that either this all counts as one large breach and thus Count IV duplicates Count I, or alternatively that Count IV fails to state a claim for a breach of implied covenant.

"[T]he implied covenant of good faith and fair dealing is recognized only where a contract is silent as to the issue in dispute."[64] "Absent a contractual

---

[64] *AQSR India Priv., Ltd. v. Bureau Veritas Holdings, Inc.*, 2009 WL 1707910, at *11 (Del. Ch. June 16, 2009).

provision dictating a standard of conduct, there is no legal difference between breaches of contract made in bad faith and breaches of contract not made in bad faith."[65]

Here, Plaintiffs' theory that Defendants breached for discriminatory reasons is not separate from the underlying breach of contract. The alternative to an unenforceable contract theory fails because implied covenants are for when a contract is silent, not about reimposing explicit contractual obligations after finding a contract unenforceable. The reimposition of contractual duties can be done through unjust enrichment, as explained further below, but not through implied covenant.

Plaintiffs have failed to state a valid claim for Count IV separate from the original breach of contract claim in Count I. Thus, the motion to dismiss Count IV as to Defendant Schell Brothers is **GRANTED**.

### c. Count III: Deceit & Count V: Fraud

In Delaware, fraud and deceit are interchangeable.[66] Delaware also does not distinguish between fraud and fraudulent inducement.[67] Plaintiffs raise two fraud claims.

---

[65] *AQSR India Priv., Ltd. v. Bureau Veritas Hldgs., Inc.*, 2009 WL 1707910, at *11 (Del. Ch. June 16, 2009) (citations omitted).

[66] *See e.g.*, *Nye Odorless Incinerator Corp. v. Felton*, 162 A. 504, 510 (Del. Super. 1931); *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983); 6 *Del. C.* § 73-103(9).

[67] *Trifecta Multimedia Holdings Inc. v. WCG Clinical Servs. LLC*, 318 A.3d 450, 466–67 (Del. Ch. 2024).

Count III (labeled "Deceit and Bad Faith During Contract Negotiations") claims the Defendants induced the Sedghis into entering into a contract in which Defendants wrote that they could breach for discriminatory reasons. Count III alleges "[t]he plain language of Section 11" as giving Defendants ". . .a risk-free and unilateral catch-all release from the Purchase Agreement based solely criteria subjectively determined by Defendants as to 'community, culture, or operations', and as such illustrates Defendants' malicious negotiation tactics."[68] Plaintiffs claim this language shows Defendants had no intention of honoring the contract after obtaining the Sedghis' down payment.[69]

Count V (labeled "Fraud") claims that after the initial breach, Defendants mislead the Sedghis in an email on April 19, 2021 which concluded with "[w]e are now left with the following options: 1. All parties can sign a mutual termination agreement and the deposit will be immediately returned to you; or 2. Should you desire to litigate the termination, we will retain the deposit in escrow pending a resolution of the dispute."[70] Plaintiffs claim this induced the Sedghis to sign an addendum that the Sedghis waive any claims regarding a sewer drain, not included but described as setting forth ". . . that a homeowner has a proper expectation of the storm drain location and to prevent future liability for [Defendant Schell Brothers]

---

[68] *See* Compl. No. 3 at ¶ 61.
[69] *Id.* at ¶ 60, 62.
[70] Compl. No. 3 Ex. A.

should a homeowner later have an issue with the location of the storm drain."[71] Plaintiffs allegedly signed the addendum to salvage the deal, but afterwards, Defendants still refused to return the down payment unless Plaintiffs waived their rights to bring suit for the claims at issue in this litigation. Count V also presents an alternative theory that these fraudulent statements mislead Plaintiffs as to their contractual entitlement to receive the downpayment to induce the Plaintiffs to waive their rights to bring suit for discrimination.[72] For damages, Count V alleges, "the Sedghis have sustained, and will continue to sustain, substantial injury and damages including the deprivation of the peaceful use, occupancy and enjoyment of the Baywind Home, the deprivation of use and enjoyment of their deposit monies, and damage from mental grief and anguish."[73]

Defendants move to dismiss on grounds that either Count III duplicates Count V, or alternatively that Counts III and V fail to sufficiently plead the elements of fraud. Specifically, Defendant contends that Count III fails as Plaintiffs disclaim reliance in Section 18 of the Purchase Agreement, and Count V fails to plead reliance.

---

[71] *Id.*
[72] *Id.*
[73] Comp. No. 3 at ¶ 93.

Under Delaware common law, a plaintiff must show:

> (1) the defendant falsely represented or omitted facts that the defendant had a duty to disclose; (2) the defendant knew or believed that the representation was false or made the representation with a reckless indifference to the truth; (3) the defendant intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted in justifiable reliance on the representation; and (5) the plaintiff was injured by its reliance.[74]

Superior Court Civil Rule 9(b) requires that ". . . the circumstances constituting fraud. . . shall be stated with particularity. Malice, intent, knowledge and other condition of mind of a person may be averred generally."[75] Public policy requires a specific articulation of which statements would have been false or materially misleading.[76] Furthermore,

> . . . the anti-bootstrapping rule bars a fraud claim where the plaintiff merely "adds the term 'fraudulently induced' to a complaint or alleges that the defendant never intended to comply with the agreement at issue at the time the parties entered into it," but it does not prevent a fraud claim against defendants who "knew 'contractual representations' were false, and yet made them anyway."[77]

For Count III, there is no false representation given. Plaintiffs point to the potentially discriminatory language in the Purchase Agreement which provided

---

[74] *DCV Holdings, Inc. v. ConAgra, Inc.*, 889 A.2d 954, 958 (Del. 2005) (citing *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983)).

[75] Super. Ct. Civ. R. 9(b).

[76] *See Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 142–43 (Del. Ch. 2009).

[77] *Levy Fam. Invs., LLC v. Oars + Alps LLC*, 2022 WL 245543, at *8 (Del. Ch. Jan. 27, 2022) (quoting *Anschutz Corp. v. Brown Robin Cap., LLC*, 2020 WL 3096744, at *15 (Del. Ch. June 11, 2020)).

Defendants the ability to circumvent protections from discriminatory practices.[78]

Even accepting all factual allegations in the pleadings at face value in favor of the Plaintiffs, this is not a false representation of fact or an omission of material facts but instead an honest but brazen declaration of the intent of Defendant Schell Brothers to breach due to discrimination based on community or culture. While allegations of unequal bargaining power may suggest that the contract might be unenforceable on grounds of unconscionability, the "deceit" described is not based on falsity. Count III essentially alleges that the Defendants never intended to comply with the Purchase Agreement at issue at the time the parties entered it and thus is barred by the anti-bootstrapping doctrine. Thus, Count III fails to state a claim for fraud.[79]

For Count V, the inducement alleged has no real connection to the reliance or damages outside the breach of contract. Count V describes an inducement baiting Plaintiffs to sign the sewer addendum, then describes damages about the underlying Purchase Agreement falling through, not damages related to signing the sewer addendum.[80] The only damage Plaintiffs directly suffered from signing the sewer addendum is jumping through an extra hoop that ultimately proved pointless in their

---

[78] *See* Compl. No. 3 at ¶ 60–62.

[79] Based on this conclusion, the Court does not need to address Defendants' arguments relying on the anti-reliance clause of the contract. *But see Abry Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1035–36 (Del. Ch. 2006) (discussing when and to what extent anti-reliance clauses are enforceable and applicable to specific fraud pleadings).

[80] *See* Compl. No. 3 at ¶ 93.

hopes of salvaging the deal or recovering the down payment without suing. Thus, the actual damage suffered element is not satisfied for Count V's main theory.

For Count V's alternative theory, there also is no actual reliance, because Defendants trying to induce Plaintiffs to 'waive your rights to sue for discrimination' does not match Plaintiffs' actual reliance of 'waiving rights to sue for the sewer drain.' This alternative theory also fails to allege damages relating to Plaintiffs waiving their rights to sue about a sewer drain to a house they never closed on. As stated above, the damages Plaintiffs include are related to the failure to close on the house and are not damages stemming from the alleged fraud. Under either theory, Count V fails to state a claim. Thus, the motion to dismiss Counts III and V as to Defendant Schell Brothers is **GRANTED**.

### d. Count VIII: Unjust Enrichment

"Unjust enrichment is defined as 'the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience.'"[81] "A claim for unjust enrichment is not available if there is a contract that governs the relationship between parties that gives rise to the unjust enrichment claim."[82]

---

[81] *Schock v. Nash*, 732 A.2d 217 (Del. 1999) (quoting *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1062 (1988)).
[82] *Kuroda v SPJS Holdings, L.L.C.*, 971 A.2d 872, 891 (Del. Ch. 2009).

However, a contract itself is not necessarily the measure of a plaintiff's right where the claim is that the contract arose from wrongdoing and the defendant has been unjustly enriched by the benefits flowing from the contract.[83] Furthermore, ". . . a party may plead 'in the alternative' claims seeking recovery under theories of contract or quasi-contract. This is generally so, however, when there is doubt surrounding the enforceability or existence of the contract."[84] "Under Delaware common law, contracts that offend public policy or harm the public are deemed void, as opposed to voidable."[85] An agreement which is unconscionable is voidable and the proper remedy is to declare it invalid.[86]

Accepting all facts in the complaint as true for this motion to dismiss, Plaintiffs allege that the Purchase Agreement arose through wrongdoing, as the language of the Purchase Agreement showed Defendants entered this deal with the intention of discriminatorily breaching and keeping the downpayment.[87] Additionally, Plaintiffs adequately allege that the Purchase Agreement had language that allowed Defendant Schell Brothers to unilaterally walk away from the contract after making a discriminatory determination that Plaintiffs were of an unacceptable

---

[83] *Chumash Cap. Invs., LLC v. Grand Mesa Partners, LLC*, 2024 WL 1554184, at *16 (Del. Super. Apr. 10, 2024) (citing *LVI Grp. Invs., LLC v. NCM Grp. Holdings, LLC*, 2018 WL 1559936, at *16 (Del. Ch. Mar. 28, 2008)).

[84] *Vichi v. Koninklijke Philips Elecs. N.V.*, 62 A.3d 26, 59 (Del. Ch. 2012) (citations omitted).

[85] *Lincoln Nat'l Life Ins. Co. v. Joseph Schlanger 2006 Ins. Tr.*, 28 A.3d 436, 441 (Del. 2011) (emphasis removed).

[86] *See James v. Nat'l Fin., LLC*, 132 A.3d 799, 837 (Del. Ch. 2016).

[87] *See* Compl. No. 3 at ¶ 25.

"culture."[88] Thus, through the course of this litigation, there is a possibility that the Purchase Agreement could be deemed void as a matter of public policy, or voidable as unconscionable, and there is no enforceable contract. Therefore, Count VIII for unjust enrichment is an acceptable alternative theory to the breach of contract claim. Thus, the motion to dismiss Count VIII as to Defendant Schell Brothers is **DENIED**.

## CONCLUSION

Ultimately, Plaintiffs' Contractual Claims (Counts I–V and VIII) are not time-barred as a matter of law. However, Plaintiffs still fail to state contractual claims against Defendant Horner in his individual capacity, and thus the motion to dismiss Defendant Horner with respect to the Contractual Claims (Counts I–V and VIII) is **GRANTED**. Plaintiffs further fail to state claims for replevin, conversion, detinue, deceit, fraud, or bad faith breach of contract. Thus, the motion to dismiss Defendant Schell Brothers with respect to Counts II–V is **GRANTED**. Plaintiffs state a valid claim of unjust enrichment as an alternative to breach of contract in the event the contract is deemed void, and thus the motion to dismiss Defendant Schell Brothers with respect to Count VIII is **DENIED**.

The case shall proceed with Counts I and VIII against Defendant Schell Brothers and Counts VI–VII against both Defendant Schell Brothers and Defendant Horner.

---

[88] *See id.* at ¶ 23.

**IT IS SO ORDERED.**

/s/ *Mark H. Conner*
_____
Mark H. Conner, Judge


cc: Prothonotary